IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION



| | |
|---|---|
| CAMPAIGN LEGAL CENTER ET AL., § <br> PLAINTIFFS, § <br> § <br> V. § <br> § CAUSE NO. 1:22-CV-92-LY <br> JOHN B. SCOTT, IN HIS OFFICIAL § <br> CAPACITY AS SECRETARY OF THE § <br> STATE OF TEXAS, § <br> DEFENDANT. § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On May 9, 2022, the court called the above-referenced declaratory-judgment and injunctive action for bench trial. Plaintiffs and Defendant John B. Scott, Secretary of the State of Texas (the "Secretary") appeared by attorney. At issue is whether the Secretary violated the National Voter Registration Act (the "Act") by refusing to release certain voter-registration records upon Plaintiffs' request. The court consolidated Plaintiffs' motion for preliminary injunction (Doc. #20) with the trial on the merits. See FED. R. CIV. P 65(a)(2). Having considered the briefing, arguments of counsel, applicable law, and entire record in this case, the court makes the following findings of fact and conclusions of law, ultimately concluding that the Secretary's refusal to disclose the records violates the Act.[1] The court will award declaratory and mandatory-injunctive relief and render final judgment by separate order.

---

[1] All findings of fact contained herein that are more appropriately considered conclusions of law are to be so deemed. Likewise, any conclusion of law more appropriately considered a finding of fact shall be so deemed.

## I.   BACKGROUND

The parties do not dispute the underlying facts of this case. The court derives the following summary from the record of evidence, which includes the exhibits to Plaintiffs' motion for preliminary injunction, the Secretary's response, and Plaintiffs' reply.[2]

In 2019, then Texas Secretary of State David Whitley issued Election Advisory No. 2019-02, which implemented a program aimed to remove suspected non-citizen voters from Texas voter rolls. Under the program, Whitley's office compared voter-registration data with driver's-license and identity-card data from the Texas Department of Public Safety ("DPS"). If an individual on the voter-registration rolls previously provided documentation to DPS indicating non-citizenship, Whitley's office added the individual's information to a database of suspected non-citizen voters. Whitley's office provided information from this database to local election officials, instructing the officials to send notice letters to the individuals on the list and cancel their voter registrations if: (1) the individual responded to the notice with information indicating non-citizenship; (2) the individual failed to respond to the notice within 30 days; or (3) the notice was returned as undeliverable with no forwarding information available.

Civic-engagement organizations and affected Texans sued Whitley and other state officials in 2019 (the "2019 Lawsuits"), arguing that the program largely affected newly naturalized voters and illegally intimidated these voters into de-registering or not voting. *See, e.g., Texas League of United Latin Am. Citizens v. Whitley*, No. CV SA-19-CA-074-FB, 2019 WL 7938511 (W.D. Tex. Feb. 27, 2019). The record from the 2019 Lawsuits illustrates the various shortcomings of Whitley's program. *Id.* at *1 ("Notwithstanding good intentions, the road to a solution was

---

[2] At trial, the court accepted into evidence the parties' jointly prepared binder titled "Record Evidence," which includes the parties' briefing on the motion for preliminary injunction and all exhibits.

2

inherently paved with flawed results"). Whitley's office initially identified around 98,000 suspected non-citizen voters, but shortly after releasing the lists to local election officials, the office "realiz[ed] that 25,000 names should not have been included." *Id.* The court characterized the notice letters sent to suspected non-citizen voters—many of whom were, in fact, newly naturalized U.S. citizens—as "ham-handed and threatening correspondence from the state which did not politely ask for information, but rather exemplifies the power of government to strike fear and anxiety and to intimidate the least powerful among us." *Id.* Roughly a month after the program began, election officials identified only 80 of the 98,000 suspected non-citizens as ineligible to vote. *Id.* The court ultimately assessed Whitley's program as "a solution looking for a problem." *Id.*

The parties settled the 2019 Lawsuits pursuant to a written agreement (the "Settlement Agreement"). The state defendants agreed to rescind Election Advisory 2019-02 and instruct local election officials to disregard the original lists of suspected non-citizen voters. The state defendants also agreed to modify the type of DPS data used for future voter-roll maintenance programs, aiming to eliminate the type of stale information that previously flagged newly naturalized voters as non-citizens. The state defendants further agreed that for any new database created for similar purposes, DPS must send daily updates on changed citizenship status for any individual included on the list. Finally, the state defendants agreed to provide notice to the attorneys involved in the Settlement Agreement 10 days before sending local election officials information from any new database of suspected non-citizen voters.

On August 20, 2021, the Office of the Attorney General sent notice to the attorneys involved in the Settlement Agreement that the Secretary had conducted a new data-matching program with DPS and planned to send 11,197 records of suspected non-citizen voters to local

election officials. The Office of the Attorney General sent a similar notice on September 14, 2021, indicating that the Secretary would send records to local election officials on a weekly basis.

On August 27, 2021, Plaintiffs sent a letter to the Secretary seeking:

> The list of all 11,197 registrants your office identified as potential non-U.S. citizens, including the date each individual registered to vote, the effective date of each individual's voter registration; the date each individual provided documentation to DPS, the issuance date of each individual's current driver's license or personal identification; the documents provided to DPS showing proof of lawful presence but not U.S. Citizenship; and the voting history of each of these individuals.

Plaintiffs sent a second request on October 20, 2021, seeking the list of 49 registrants identified in the Secretary's first three weeks of the weekly updates to local election officials. In total, Plaintiffs requested records for 11,246 suspected non-citizen voters (the "Records").

Plaintiffs requested the Records pursuant to the Act, which requires the Secretary to "maintain . . . and [] make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). The Act creates a private right of action for those "aggrieved by a violation of [the Act]." 52 U.S.C. § 20510(b).

The Secretary responded to Plaintiffs' first request on September 14, 2021, arguing that the Texas Public Information Act controls and asking Plaintiffs to clarify certain aspects of the request. The Secretary sent Plaintiffs a second letter on November 3, 2021, asserting that the Texas Public Information Act protects the Records from disclosure. *See* Tex. Gov't Code Ann. § 552.001 *et seq.*

Around the same time, Plaintiffs made similar records requests to individual counties. The record before the court includes localized lists of suspected non-citizen voters from election officials in Tarrant County, Travis County, and Collin County, which the officials sent to Plaintiffs

4

in January and February of 2022. The lists show that the Secretary's new program continues to flag eligible voters as suspected non-citizens: in Tarrant County, at least 119 of the 675 suspected non-citizen voters provided documentation confirming citizenship. Likewise, 93 of the 385 suspected non-citizen voters in Travis County provided proof of citizenship, and 88 of the 302 suspected non-citizen voters in Collin County provided proof of citizenship.

Plaintiffs sue the Secretary under the Act, requesting declaratory and injunctive relief, as well as attorney's fees and costs. *See* 52 U.S.C. § 20510(b), (c). Specifically, Plaintiffs request "[R]ecords showing every individual identified . . . as a potential non-U.S. citizen based on driver's license and identification information from [DPS], as well as the information upon which the Secretary of State relied to make a determination about each voter's citizenship status." Following trial, Plaintiffs submitted a proposed order (Doc. #52-1) requesting an injunction that orders the Secretary to provide the following information for the 11,246 suspected non-citizen voters (the "Request"):

  a. Voter name (first, middle, last, suffix)
  b. Residential address (street number and name, apartment number, city, state, zip code, county)
  c. Mailing address, if different
  d. Date of birth
  e. Phone number
  f. Email address
  g. Voter Identification Number
  h. Date of voter registration application
  i. Effective date of voter registration
  j. Status of voter registration
  k. Any known prior voter registration statuses and dates of changes in voter registration status
  l. All known voting history
  m. Issuance date of current driver's license, personal identification, or election identification certificate
  n. Date on which individual provided the DPS with documentation indicating lawful presence but not U.S. citizenship, if known
  o. Documents provided to DPS on the date indicated in subsection (n) above indicating proof of lawful presence but not U.S. citizenship, if known

5

    p. All other information about these individuals within Texas's electronic voter registration database.[3]

The court will first address the Secretary's jurisdictional and threshold arguments that the Secretary has not violated the Act in refusing to disclose the Records. After disposing of these arguments, the court will grant Plaintiffs' motion and render a mandatory injunction ordering the Secretary to release letters (a), (g), (h), (i), (j), (k), (l), (m), and (n) of Plaintiffs' Request, subject to certain limitations that the court will outline by separate order.

## II. JURISDICTION

The Secretary first argues that the court cannot decide this case on the merits because Plaintiffs lack standing. The Secretary argues that Plaintiffs have not shown sufficient record evidence satisfying the injury-in-fact requirement. Plaintiffs respond that the Act's private right of action for enforcing the public-disclosure provision gives Plaintiffs standing.

Article III of the Constitution limits a federal court's jurisdiction to cases or controversies. U.S. CONST. art. III, § 2. Standing is a doctrine rooted in the traditional understanding of a case or controversy. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). A plaintiff must have standing for a district court to have jurisdiction over the case. *Id.* The Supreme Court has identified three constitutional standing requirements: injury-in-fact, causation, and redressability. *Id.*; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

For a plaintiff to satisfy the injury-in-fact requirement, she must show that the injury is "concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). A plaintiff can show a concrete "informational injury" when a defendant fails to

---

[3] The parties inform the court that on or about June 24, 2022, the Secretary provided Plaintiffs with information pertaining to letters (h) through (n) of Plaintiffs' request without "mak[ing] any concessions about the merits of this case or waiv[ing] any [] arguments." The Secretary further advises the court that the information in letters (m) and (n) are the same in the Records and that the Records do not include the information requested in letter (o).

6

produce information subject to public disclosure. *Id.* at 2214; *Federal Election Comm'n v. Akins*, 524 U.S. 11, 24–25 (1998). A plaintiff must show that an informational injury involves "downstream consequences," which include adverse effects related to the information deficit. *TransUnion*, 141 S. Ct. at 2214.

The court agrees with Plaintiffs that the evidence demonstrates a concrete "informational injury" with "downstream consequences" sufficient to satisfy Article III's standing requirements. The Act imposes a public-disclosure requirement for certain information and creates a private right of action for violations of this requirement. *See id.* at 2204–05 (Congress's decision to grant cause of action to sue over statutory obligation is "instructive" when evaluating injury-in-fact requirement). Plaintiffs also demonstrate that the Secretary's refusal to disclose the Records has resulted in adverse "downstream consequences," including the lack of opportunity for Plaintiffs to identify eligible voters improperly flagged in the database. The court has jurisdiction over this cause because Plaintiffs have established standing and Plaintiffs' claims arise under the laws of the United States. *See* 28 U.S.C. § 1331.

### III. ANALYSIS

Plaintiffs argue that the Act requires the Secretary to release the Records. The Secretary argues that (1) the Act does not require disclosure of "privileged information regarding pending law-enforcement investigations"; (2) the Driver's Privacy Protection Act prevents the Secretary from releasing the Records to Plaintiffs; (3) the Act does not require the Secretary to electronically transmit the Records to Plaintiffs; and (4) the Act's public-disclosure provision is unconstitutional because it violates the anti-commandeering doctrine.

### A. *Investigative privilege*

The Secretary first argues that the Act does not require disclosure of "confidential, privileged information regarding pending law-enforcement investigations." The Secretary argues that the Records include names, addresses, and other identifying information for individuals that the Secretary suspects of violating Texas's requirement that a registered voter be a United States citizen. *See* Tex. Elec. Code Ann. § 13.001(a)(2). Knowingly or intentionally falsifying information on a voter registration application—including citizenship status—constitutes a criminal offense in Texas. Tex. Elec. Code Ann. § 13.007. The Secretary argues that the Records are "part of [the Secretary's] ongoing review into whether to refer matters to the Attorney General" and therefore the "investigative privilege" protects the information from disclosure. Plaintiffs respond that the Secretary's office uses the Records to aid local election officials in maintaining the voter rolls, not to trigger criminal investigations.

The Act does not discuss if, or to what extent, a state voting agency may withhold or redact otherwise disclosable voter-roll-maintenance data based on investigative privilege or confidentiality concerns. *See* 52 U.S.C. § 20501 *et seq.* However, as the Secretary points out, the Fifth Circuit recognizes "a qualified privilege protecting investigative files in an ongoing criminal investigation." *In re U.S. Dep't of Homeland Sec.*, 459 F.3d 565, 569 (5th Cir. 2006) (quoting *Coughlin v. Lee*, 946 F.2d 1152, 1159 (5th Cir.1991)). Importantly, this privilege is "qualified" and relates only to "ongoing criminal investigation[s]." *Id.* In naming types of information that "probably would not be protected," the circuit explicitly included "documents pertaining to . . . people who *merely are suspected of a violation* without being part of an ongoing criminal investigation." *Id.* at 571 (emphasis added). Brian Keith Ingram, the Director of the Elections Division at the Secretary's office, testified that "[a] person's mere presence [in] the [Records] does

not by itself prove that the person is a non-citizen or that the person engaged in criminal conduct." Ingram further testified that the Secretary "has not yet referred any voter records from the initial dataset or weekly files to the Attorney General." The court agrees with Plaintiffs that the Records do not relate to any "ongoing criminal investigations," but instead fall into the category of "documents pertaining to . . . people who *merely are suspected of a violation*" that "probably would not be protected" by any investigative privilege. *See id.* at 571.

Both Plaintiffs and the Secretary direct the court to *Public Interest Legal Foundation, Inc. v. North Carolina State Board of Elections*, arguing that the case supports their respective positions on the issue of investigative privilege. 996 F.3d 257, 259 (4th Cir. 2021). *Public Interest* addresses a similar scenario where North Carolina implemented a program identifying "voter registrants . . . [who] potentially fail[] to satisfy the statutory citizenship requirement." *Id.* After receiving a records request pursuant to the Act, North Carolina refused to disclose the identities of the suspected non-citizen voters, arguing in part that "the identity of any prior or current registrant . . . may be subject to review by federal law enforcement." *Id.* at 262. In reversing the district court's dismissal of the case, *Public Interest* recognized that the Act "does not require automatic disclosure of all categories of documents" and instructed the lower court to "consider . . . whether and to what extent the documents at issue should be kept confidential" in light of "the concerns of confidentiality regarding criminal investigations." *Id.* at 264, 266–67. Importantly, *Public Interest* involved "grand jury investigations of 789 individuals statewide," which the circuit notes "may be subject to a sealing order and may overlap with the documents requested [pursuant to the Act]." *Id.* at 266–67. *Public Interest* ultimately instructed the lower court to "consider separately which documents and information are subject to protection based on their relationship to ongoing criminal investigations, and order redaction to protect exonerated potential noncitizens and their

9

sensitive information." *Id.* at 268. The court agrees with Plaintiffs that the existence of pending criminal investigations distinguishes *Public Interest* from the case at issue, where the Secretary has provided the court with testimony indicating that the Secretary's office has not referred any individual identified in the Records to the Attorney General for criminal prosecution.

Further undermining the Secretary's investigative-privilege argument is that fact that Plaintiffs obtained information about individuals identified in the Records from Tarrant, Travis, and Collin counties in January and February of 2022, after the Secretary had shared the Records with local election officials. The datasheets that the county election officials provided Plaintiffs contain identifying information for the suspected non-citizen voters, including names, voter identification numbers, and, in the case of Tarrant County, voter addresses. It is not clear to the court how the Secretary will "protect [the] confidential information" of the thousands of individuals identified in the Records if this information can be obtained through local election officials.

The court rejects the argument that the Secretary can evade the Act's public-disclosure provision under the guise of investigative privilege, especially when the Secretary's representative has testified that no investigation currently exists. The court suspects that the Secretary's refusal to disclose the Records has less to do with the interests of the individuals identified in the Records and more to do with the Secretary's own interests.[4]

**B.     *Driver's Privacy Protection Act***

Next, the Secretary argues that the Driver's Privacy Protection Act (the "Driver's Act") protects the Records from public disclosure. Plaintiffs respond that the Driver's Act authorizes

---

[4] When the "flawed results" of Whitley's original program came to light in 2019, Whitley publicly apologized "for the failure to seek confirmation of the accuracy, appropriateness, competency, and due diligence of the process." *Whitley*, 2019 WL 7938511 at *1. Whitely ultimately resigned as Texas Secretary of State following widespread criticism of the program.

disclosure of the Records through the statutory exception for "investigation in anticipation of litigation."

The Driver's Act broadly prevents disclosure of "personal information . . . about any individual obtained by the department in connection with a motor vehicle record." 18 U.S.C. § 2721(a)(1). "Personal information" includes "an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information." 18 U.S.C. § 2725(3). The Secretary argues that because the Records rely on information from DPS, the Driver's Act precludes the information from disclosure.

The Driver's Act sets out 14 circumstances where a state may permissibly disclose a driver's personal information. *See* 18 U.S.C. § 2721(b). One circumstance allows disclosure "[f]or use in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, *investigation in anticipation of litigation*, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court." 18 U.S.C. § 2721(b)(4) (emphasis added). "Investigation in anticipation of litigation" is "best understood to allow background research to determine whether there is a supportable theory for a complaint, a theory sufficient to avoid sanctions for filing a frivolous lawsuit, or to locate witnesses for deposition or trial testimony." *Maracich v. Spears*, 570 U.S. 48, 63–64 (2013).

Plaintiffs argue that the "investigation in anticipation of litigation" exception applies because Plaintiffs seek the Records to determine whether to sue to enforce the Settlement Agreement. Alternatively, Plaintiffs argue that they seek the Records to determine whether to bring an action alleging that the Secretary's new program unlawfully burdens the voting rights of

11

newly naturalized citizens. The court agrees with Plaintiffs that the Driver's Act allows for disclosure under these circumstances. Also supporting this conclusion is the fact that courts have interpreted the Act to require disclosure of voter-registration applications, many of which are completed at motor vehicle offices "in connection with a motor vehicle record." *See Public Interest*, 996 F.3d at 265 ("voter registration applications generally are subject to disclosure under [the Act]"). The court concludes that the Driver's Act does not prevent the Secretary from producing the Records.

## C.   *Transmitting electronic records*

Next, the Secretary argues that the Act does not require the Secretary to electronically transmit the Records to Plaintiffs. Under the Secretary's logic, Plaintiffs did not make a valid request for records under the Act because Plaintiffs did not explicitly ask to "inspect" or "photocopy" the Records. *See* 52 U.S.C. § 20507(i)(1) (requiring state election agency to "make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning [voter-roll-maintenance activities]"). The Secretary argues that because Plaintiffs requested that the Secretary transmit the records "electronically by email . . . or FTP transfer if available," Plaintiffs did not provide valid notice under the Act. The Secretary provides no authority to support this cramped view of the Act's public-disclosure provision. At trial, the Secretary's attorneys noted that the Secretary keeps the Records in an electronic database through a third-party vendor, so it is unclear to the court how Plaintiffs might "inspect" or "photocopy" such a database. Courts addressing similar claims regularly presume that meaningful public disclosure entails electronic production of the documents at issue. *See, e.g., Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1336 (N.D. Ga. 2016) (holding that Act's public-disclosure requirement applies to electronic records); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 724

(S.D. Miss. 2014) (finding Act's disclosure requirement satisfied upon state's production of electronic voter rolls). The court rejects the Secretary's interpretation of the Act.

### D.   *Anti-commandeering doctrine*

Finally, the Secretary argues that the Act's public-disclosure provision violates the anticommandeering doctrine and is therefore unconstitutional. *See* U.S. CONST. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."). Plaintiffs respond that the public-disclosure provision constitutes a valid exercise of Congressional power under the Times, Places, and Manner Clause. *See* U.S. CONST. Art. 1 § 4, cl. 1 ("The Times, Places and Manner of holding Elections . . . shall be prescribed in each State . . . but the Congress may at any time by Law make or alter such Regulations").[5]

"The anticommandeering doctrine . . . is simply the expression of a fundamental structural decision incorporated into the Constitution, *i.e.*, the decision to withhold from Congress the power to issue orders directly to the States." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1475 (2018). The anticommandeering doctrine prohibits Congress from "conscripting [a] State's officers" to enforce a federal statute. *Printz v. United States*, 521 U.S. 898, 935 (1997). However, the anticommandeering doctrine does not render a statute unconstitutional if the Constitution

---

[5] On April 13, 2022, the Secretary filed and served a Notice of Constitutional Challenge to a Statute (Doc. #32), notifying the Office of the Attorney General of the United States that a federal statute had been challenged in this case. *See* FED. R. CIV. P. 5.1. The United States filed an Acknowledgement of Defendant's Notice of Constitutional Challenge on June 9, 2022, noting that "it is not clear whether the Court will need to reach the constitutional question in order to resolve this case . . . . [T]he United States has concluded that a decision on whether to intervene in this case would be premature at this time." Because the court will reject the Secretary's constitutional argument, the United States need not intervene in this action. *See* FED. R. CIV. P. 5.1(c) ("Before the time to intervene expires, the court may reject the constitutional challenge").

otherwise "empowers Congress to impose on the states [] the burden at issue." *Voting Rts. Coal. v. Wilson*, 60 F.3d 1411, 1415 (9th Cir. 1995).

Courts have held that the Act constitutes a valid exercise of Congressional power under the Times, Places, and Manner Clause and therefore does not violate the anticommandeering doctrine. *See, e.g., Ass'n of Cmty. Organizations for Reform Now v. Miller*, 129 F.3d 833, 836 (6th Cir. 1997) (rejecting anticommandeering challenge to Act because "[the Times, Places, and Manner Clause] specifically grants Congress the authority to force states to alter their regulations regarding federal elections"); *Ass'n of Cmty. Organizations for Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 793 (7th Cir. 1995) (concluding that Act—including provisions related to voter registration—is valid exercise of Congressional power under Times, Places, and Manner Clause); *Wilson*, 60 F.3d at 1414 (holding Act constitutional under "broad power" granted to Congress under Times, Places, and Manner Clause). The Secretary admits that this line of cases "can complicate the application of the anticommandeering doctrine." The Secretary instead directs the court to section of *Branch v. Smith* that, as the Secretary points out, lacked approval from a majority of the Court. 538 U.S. 254, 280 (2003) (plurality op.). The Secretary relies on *Branch* to argue that Congress may constitutionally legislate under the Times, Places, and Manner Clause only when a state has "defaulted on any obligation[]" related to federal elections. The court finds the Secretary's argument unpersuasive and contradictory to a large body of authority upholding the Act as constitutional. *See, e.g., ACORN*, 56 F.3d 791 at 794 ("Even when there is no abuse, as we have seen, Congress can . . . regulate federal elections and force the state to bear the expense of the regulation.").

Alternatively, the Secretary argues that the Act's public-disclosure provision is not a regulation of the time, place, or manner of holding an election. The Secretary does not provide

authority to support this position, but instead informs the court that "[t]he Framers understood [the word "manner"] as referring to the *procedures* for holding an election." Under the Secretary's logic, the public-disclosure provision does not constitute a procedure for holding an election. Plaintiffs respond that Congress's power to regulate elections necessarily includes the power to enforce these regulations. *See Ex parte Siebold*, 100 U.S. 371, 387 (1879) (holding, in context of federal voting regulations, "it cannot be disputed that if Congress has power to make regulations it must have the power to enforce them"). The court agrees with Plaintiffs. The public-disclosure provision aims to hold states accountable for complying with the Act. *See Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334–35 (4th Cir. 2012) (holding that Act's public-disclosure provision "embodies Congress's conviction that Americans who are eligible under law to vote have every right to exercise their franchise, a right that must not be sacrificed to administrative chicanery, oversights, or inefficiencies."). The court concludes that the Act and, in particular, the public-disclosure provision, constitutes a valid exercise of Congressional power under the Times, Places, and Manner Clause.

E.   *Injunctive relief*

Having rejected the Secretary's threshold arguments, the court will turn to Plaintiffs' request for injunctive relief. A party seeking an injunction must show: (1) success on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest. *Environment Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 824 F.3d 507, 533 (5th Cir. 2016).

First, Plaintiffs have succeeded on the merits. The records requests that Plaintiffs made to the Secretary on August 27, 2021, and October 20, 2021, properly invoke the public-disclosure

provision of the Act. *See* 52 U.S.C. § 20507(i). Plaintiffs satisfied the Act's notice requirements before filing suit. *See* 52 U.S.C. § 20510(b). The Secretary's refusal to disclose the Records violates the Act. *See* 52 U.S.C. § 20507(i).

Second, Plaintiffs have demonstrated that failure to grant the injunction will result in irreparable injury. The Act's public-disclosure provision serves as a tool to carry out the Act's stated purposes, which include "protect[ing] the integrity of the electoral process," "enhanc[ing] the participation of eligible citizens as voters in elections for Federal office," and "ensur[ing] that accurate and current voter registration rolls are maintained." *See* 52 U.S.C. § 20501(b). The Secretary's refusal to disclose the information irreparably injures Plaintiffs' ability to inspect the Records for accuracy and legality. *See Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1350 (N.D. Ga. 2016) (state's refusal to disclosure records under the Act constituted irreparable harm).

Third, Plaintiffs have demonstrated that the injury stemming from the State's refusal to disclose the Records outweighs any damage that the injunction will cause the Secretary. Other than the Secretary's argument related to privacy concerns for individuals identified in the Records, the Secretary does not indicate that an injunction would damage the Secretary. The court finds the Secretary's privacy arguments unpersuasive because the information at issue exists in Texas's public voter records. Plaintiffs also demonstrated that portions of the Records can be obtained through local election officials. The injury related to the Secretary's refusal to produce the Records outweighs any damage that an injunction will cause the Secretary.

Finally, Plaintiffs have demonstrated that the injunction will not disserve the public interest. Voting is a right—and a source of power—bestowed upon citizens of the United States. The Act aims to increase the number of citizens who register to vote while balancing the need for accurate and current voter registration rolls. *See* 52 U.S.C. § 20501(b). The public-disclosure

provision provides an additional layer of oversight and transparency. Considering the shortcomings of the Secretary's previous program, additional oversight and transparency will greatly serve the public interest. The court finds and concludes that Plaintiffs are entitled to mandatory-injunctive relief on their claim that the Secretary violated the Act.

In awarding mandatory-injunctive relief, the court will order the Secretary to release the following information from Plaintiffs' Request: (a) voter name (first, middle, last, suffix); (g) voter identification number; (h) date of voter registration application; (i) effective date of voter registration; (j) status of voter registration; (k) any prior voter registration statuses and dates of changes in voter registration status; (l) all voting history; (m) issuance date of current driver's license, personal dentification, or election identification certificate; and (n) date on which individual provided DPS with documentation. The court agrees with the Secretary that items (b) through (f) and item (p) of Plaintiffs' Request fall outside the bounds of Plaintiffs' original records requests on August 27, 2021, and October 20, 2021. These items also go beyond the relief sought in Plaintiffs' complaint. The court accepts as true the Secretary's statement that the Secretary's Records do not include the information requested in item (o) and that items (m) and (n) reflect duplicative information. The court will describe the mandatory-injunctive relief in further detail by separate order.

## IV.   CONCLUSION

**IT IS ORDERED** that Plaintiffs' Rule 65 Motion for Preliminary Injunction and to Consolidate Preliminary Injunction Hearing with Trial on the Merits (Doc. #20) is **GRANTED AS FOLLOWS**: the court concludes that the Secretary violated the Act in refusing to disclose the Records upon Plaintiffs' requests. The court will award declaratory and mandatory-injunctive relief and render final judgment by separate order.

SIGNED this __2nd__ day of August, 2022.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE