# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 29, 2022

No. 22-50692

Lyle W. Cayce
Clerk

CAMPAIGN LEGAL CENTER; AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF TEXAS; MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATIONAL FUND, INCORPORATED; LAWYERS
COMMITTEE FOR CIVIL RIGHTS UNDER LAW; DEMOS A
NETWORK FOR IDEAS AND ACTION, LIMITED,

*Plaintiffs—Appellees,*

*versus*

JOHN B. SCOTT, *in his official capacity as Secretary of the State of Texas,*

*Defendant—Appellant.*

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:22-CV-92

Before JONES, HO, and WILSON, *Circuit Judges.*

JUDGMENT

This cause was considered on the record on appeal and was argued by
counsel.

IT IS ORDERED and ADJUDGED that the judgment of the
District Court is REVERSED, and the cause is REMANDED to the

Certified as a true copy and issued
as the mandate on Oct 21, 2022
Attest:
Clerk, U.S. Court of Appeals, Fifth Circuit

No. 22-50692

District Court for further proceedings in accordance with the opinion of this Court.

IT IS FURTHER ORDERED that Appellees pay to Appellant the costs on appeal to be taxed by the Clerk of this Court.

James C. Ho, *Circuit Judge*, concurring in the judgment.

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 29, 2022

Lyle W. Cayce
Clerk

No. 22-50692

———

Campaign Legal Center; American Civil Liberties Union Foundation of Texas; Mexican American Legal Defense and Educational Fund, Incorporated; Lawyers Committee for Civil Rights Under Law; DEMOS a Network for Ideas and Action, Limited,

*Plaintiffs—Appellees*,

*versus*

John B. Scott, in his official capacity as Secretary of the State of Texas,

*Defendant—Appellant*.

———

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:22-CV-92

———

Before Jones, Ho, and Wilson, *Circuit Judges*.

Edith H. Jones, *Circuit Judge*:

The Plaintiffs obtained an injunction from the district court requiring the State of Texas to provide information including the names and voter identification numbers of persons suspected of being noncitizens though registered to vote.  Reversing the district court, we hold that the organizations constituting the Plaintiffs lack standing to bring their claim

No. 22-50692

under the National Voter Registration Act of 1993 ("NVRA").
Consequently, we REVERSE and REMAND with instructions to DISMISS.[1]

# I. BACKGROUND

This action arises from federal and state law, specifically, the NVRA's "public disclosure provision," 52 U.S.C. § 20507(i)(1), and Sections 16 and 31 of the Texas Election Code.

The NVRA is designed to "increase the number of eligible citizens who register to vote" and "enhance[] the participation of eligible citizens as voters" in federal elections. 52 U.S.C. § 20501(b)(1)–(2). Equally important, the NVRA is intended to "protect the integrity of the electoral process" and "ensure that accurate and current voter registration rolls are maintained." *Id.* § 20501(b)(3)–(4). In line with the latter goals:

> Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

*Id.* § 20507(i)(1). "A person who is aggrieved by a violation of [the NVRA] may provide written notice of the violation to the chief election official of the State involved" and may file suit for injunctive relief if the violation goes uncorrected. *Id.* § 20510(b)(1)–(2).

---

[1] The U.S. Government moved in this court, for this first time, to intervene and defend the NVRA provision here at issue against a challenge by the State. In light of our disposition of this case, we DENY the motion as unnecessary.

No. 22-50692

The NVRA also provides that resident citizens can register to vote in a state when they apply for or renew their driver's licenses. *See id.* § 20504. The state must, however, cross-check registrations to ensure that only eligible voters remain on the rolls. *See id.* § 20507. To do so, the Texas Secretary of State ("the Secretary") periodically compares information in the existing statewide computerized voter registration list against citizenship information in the database of the Department of Public Safety ("DPS"). TEX. ELEC. CODE § 16.0332(a-1). Next, the Secretary sends the names of any potentially ineligible voter to appropriate local registrars. *See id.* §§ 16.033(a), .0332(a). If registrars determine a voter may be ineligible, they send "a written notice requiring the voter to submit to the registrar proof of United States citizenship." *Id.* § 16.0332(a). Failure to provide such proof can lead to cancellation of voter registrations. *See id.* §§ 16.033, 16.0332(b).

In the course of the Secretary's maintenance activity, the Secretary may "receiv[e] or discover[] information indicating that criminal conduct in connection with an election has occurred." *Id.* § 31.006(a). If the Secretary "determines that there is reasonable cause to suspect that criminal conduct occurred," then he "refer[s] the information to the attorney general." *Id.* That information only becomes public once the Secretary determines it "does not warrant an investigation," or "if referred to the attorney general, the attorney general has completed the investigation or has made a determination that the information referred does not warrant an investigation." *Id.* § 31.006(b).

The instant case is preceded by a 2019 lawsuit filed by other parties against an earlier iteration of the state's voter roll maintenance program. The State settled that case in an agreement providing that the Secretary may "obtain potential non-U.S. citizen data from DPS on a weekly basis," but the Secretary is only allowed to flag "the records of voters whose effective date

No. 22-50692

of voter registration is prior to, or no more than 30 calendar days after, the issuance date of the voter's current driver's license or personal identification card for which he or she proved lawful presence but not U.S. citizenship."[2] In other words, the Secretary only identifies "individuals who registered to vote before they presented documents at a DPS office indicating their non-citizenship." The Secretary must also notify the plaintiffs' attorneys involved in the settlement 10 days before sending local election officials information from any new database of suspected non-citizen voters.

The Texas Attorney General informed Plaintiffs' counsel in this case that the Secretary had begun matching DPS data against voter registration rolls on a weekly basis and intended to notify county election officials of voters identified as potential non-citizens. An August 2021 letter indicated that the Secretary intended to send information identifying 11,197 registered voters as potential non-citizens to local officials. In a September 2021 letter, the Secretary stated that it had identified 49 additional potential non-citizens during the first three weeks of updates.

It is unclear why Plaintiffs received the letters because *none* was a party to the 2019 settlement. Nonetheless, their counsel responded to both letters by asking the Secretary for:

> The list of all . . . registrants [the Secretary's] office identified as potential non-U.S. citizens, including the date each individual registered to vote, the effective date of each individual's voter registration; the date each individual provided documentation to DPS; the issuance date of each individual's current driver's license or personal identification; the documents provided to DPS showing proof of lawful

---

[2] This requirement was later codified. *See* TEX. ELEC. CODE § 16.0332(a-1).

No. 22-50692

presence but not U.S. citizenship; and the voting history of each of these individuals.

The Secretary denied the requests on the basis of privacy concerns, asserted that the records were protected from disclosure under the Texas Public Information Act ("PIA"), Tex. Gov't Code § 552, and indicated his intent to seek a decision from the Attorney General as to whether to withhold them.  Plaintiffs charged that withholding the requested documents violated the NVRA's public disclosure provision, and they were entitled to file suit if the violation was not corrected within 90 days.

As of January 14, 2022, 278 of the flagged voters had been confirmed as non-citizens. The status of the remaining flagged voters is unknown.  In February 2022, Plaintiffs filed suit seeking declaratory and injunctive relief against the Secretary in his official capacity for violating the NVRA.

Consolidating a hearing for preliminary injunction with the merits, the district court held a bench trial and found that Plaintiffs have standing to seek the records; the requested records are subject to the NVRA's public disclosure provision; in three counties, the Secretary's list erroneously flagged some eligible voters as non-citizens; and the Secretary's failure to produce the records violated the NVRA because no exception applied.  A separate mandatory injunction required the Secretary to provide Plaintiffs with a bevy of information regarding each of the 11,246 voters identified as potential non-citizens.  The Secretary has provided all that information except individuals' names and voter identification numbers.

The Secretary appealed and moved both the district court and this court for a stay pending appeal.  This court granted the Secretary's motion for a temporary administrative stay of the district court's injunction.  The appeal was expedited to an oral argument calendar.

No. 22-50692

## II. DISCUSSION

To resolve this appeal, we need go no further than to discuss the Plaintiffs' Article III standing to sue, a question of law subject to *de novo* review. *Rivera v. Wyeth-Ayerst Lab'ys*, 283 F.3d 315, 319 (5th Cir. 2002). "Because this case was tried, Plaintiffs needed to prove standing by a preponderance of the evidence." *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 968 F.3d 357, 367 (5th Cir. 2020) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 2136–37 (1992)). "A factual finding that a plaintiff met that burden is reviewed for clear error." *Id.* (collecting cases). Because the district court erred in finding that the plaintiffs have Article III standing, it had no jurisdiction to reach the merits. *Cook v. Reno*, 74 F.3d 97, 99 (5th Cir. 1996).

And among the three criteria necessary to confer Article III standing, we need only dwell on the first, whether Plaintiffs suffered an injury in fact that is (a) concrete[3] and particularized[4] and (b) actual or imminent. *Lujan*, 504 U.S. at 560–61, 112 S. Ct. at 2136–37 (internal quotation marks and citations omitted);[5] *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 337–42, 136 S. Ct. 1540, 1547–49 (2016). Absent such injury, "there is no case or controversy for the federal court to resolve." *Casillas v. Madison Ave. Assocs.*, 926 F.3d 329, 333 (7th Cir. 2019) (Barrett, J.).

---

[3] For an injury to be concrete it must be "real, and not abstract." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340, 136 S. Ct. 1540, 1548 (2016) (internal quotation marks omitted).

[4] "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Id.* at 339 (internal quotation marks omitted).

[5] As *Lujan* set forth, the other two criteria are that the injury is fairly traceable to the defendant's conduct and that the injury is redressable by a favorable court decision. *Id.* at 338, S. Ct. at 1547.

No. 22-50692

At trial, the Plaintiffs, though challenged by the Secretary, offered no evidence to support their claim of standing. The district court addressed the issue perfunctorily, reciting the Supreme Court's decision in *TransUnion LLC v. Ramirez* for the proposition that when a plaintiff claims "informational injury" arising from a statutory public disclosure provision, the plaintiff must also adduce "'downstream consequences,' which include adverse effects related to the information deficit." *Campaign Legal Ctr. v. Scott*, _ F. Supp. 3d _, 2022 WL 3221301, at *3 (W.D. Tex. Aug. 2, 2022) (citing *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2214 (2021)). The district court held the test satisfied by (a) the NVRA's public disclosure requirement backed by a citizen suit provision and (b) "'downstream consequences,' including the lack of an opportunity for Plaintiffs to identify eligible voters improperly flagged in the database." *Id.* at *4. (Whether the court's characterization of downstream consequences is a conclusion of law or finding of fact is ultimately immaterial.)

On appeal, Plaintiffs attempt to establish standing by asserting three theories of informational injury standing. First, Plaintiffs contend that as "civic engagement organizations . . . [they] have standing to request records under the NVRA[]" and therefore have a right to the requested registrant records. Second, they maintain that "there is [a] downstream injury with respect to the public not having visibility into how Texas is keeping its voter lists[.]" Third, Plaintiffs assert that "there is [a] downstream injury with respect to the public not having visibility into . . . properly registered Texans being discriminated against and burdened in their right to vote." The first theory was rejected by this court only a few weeks ago, and the other two

No. 22-50692

theories encompass no more than alleged injuries to *the public* and *affected Texas voters* writ large.[6]

Even if Plaintiffs had a right to the records sought, an issue we do not reach, they have not established an injury in fact. *See Spokeo*, 578 U.S. at 341, 136 S. Ct. at 1549. *Spokeo* implied[7] and *TransUnion* held that "under Article III, an injury in law is not an injury in fact." *TransUnion*, 141 S. Ct. at 2205. *TransUnion* generally rejected the Attorney General's advocacy for an unlimited "informational injury" approach to standing, in part by explaining that "the plaintiffs have identified no 'downstream consequences' from failing to receive the required information.'" 141 S. Ct. at 2214 (quoting *Trichell v. Midland Credit Mgmt.*, 964 F.3d 990, 1004 (11th Cir. 2020)). As this court recently observed, *TransUnion* rejected "the proposition that 'a plaintiff automatically satisfies the injury-in-fact requirement whenever a

---

[6] Plaintiffs argue for the first time on appeal that they seek the requested "information, in part, to fulfill their obligations to the clients they represented . . . who are parties to the 2019 Settlement Agreement." Plaintiffs claim they "will use this information to advise *their former clients as to their rights*, if any, *under the 2019 settlement agreement*, if the records show that Defendant has failed to comply with the terms therein." Because they did not articulate that theory of standing below, it is forfeited. *See Ctr. for Bio. Diversity v. EPA*, 937 F.3d 533, 542 (5th Cir. 2019) (collecting cases). In any event, such a claimed injury is insufficient to confer standing. There is no further allegation as to how the 2019 settlement is linked to claims of NVRA violation in the Secretary's 2021 maintenance efforts. And there is no explanation how the "Plaintiffs" here—as opposed to their lawyers (who are not Plaintiffs)—have any relationship to the parties that settled the 2019 case. Nor is there any evidence of an ongoing attorney-client relationship between any settling party and Plaintiffs. Finally, Plaintiffs' desire to bring legal claims on behalf of potential future litigants is entirely speculative and thus insufficient to confer standing on the organizations themselves. *See, e.g.*, *Vote.Org v. Callanen*, 39 F.4th 297, 304 (5th Cir. 2022). Plaintiffs cannot show a sufficiently concrete injury based on the prospect of a "future attorney-client relationship with as yet unascertained" individuals. *Kowalski v. Tesmer*, 543 U.S. 125, 130–31, 125 S. Ct. 564, 568 (2004).

[7] "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo*, 578 U.S. at 341, 136 S. Ct. at 1549.

No. 22-50692

statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.'" *Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, _F.4th_, 2022 WL 3355249, at *4 (5th Cir. Aug. 15, 2022) (quoting *TransUnion*, 141 S. Ct. at 2205).[8]  "[R]egardless of whether a statutory right is procedural or substantive, *Spokeo* emphasized that 'Article III standing requires a concrete injury *even in the context of a statutory violation.*'"  *Id.* (quoting *Spokeo*, 578 U.S. at 341, 136 S. Ct. at 1549) (emphasis added). Plaintiffs' initial claim of informational injury based solely on the Secretary's alleged NVRA violation founders on *Perez'*s explanation of the scope of *Spokeo* and *TransUnion*, by which we are bound.[9]

Moreover, Plaintiffs here offered no meaningful evidence regarding any downstream consequences from an alleged injury in law under the NVRA.  Their second and third theories of standing assert a statutory right of the public to the "visibility" of the Secretary's process.  But absent concrete and particularized harm to these Plaintiffs from not obtaining the requested personal voter information,[10] they assert no cognizable injury in fact.  Similarly, the district court's concern about Plaintiffs' lack of

---

[8] Even before *TransUnion* and *Perez*, this court held that a plaintiff must assert personal consequences in addition to a claimed informational injury. *See Laufer v. Mann Hosp., Inc.*, 996 F.3d 269, 272–73 (5th Cir. 2021)(plaintiff lacked standing to complain of alleged ADA disclosure violation by hotel where she evinced no intention of visiting the hotel or the state in the foreseeable future).

[9] The *Perez* interpretation of these Supreme Court holdings is consistent with other circuits' case law. *See, e.g.*, *Laufer v. Looper*, 22 F.4th 871, 880–81 (10th Cir. 2022); *Trichell v. Midland Credit Mgmt.*, 964 F.3d 990, 1004 (11th Cir. 2020) (pioneering the "downstream consequences" expression for informational injury cases); *Frank v. Autovest, LLC*, 961 F.3d 1185, 1188 (D.C. Cir. 2020); *Huff v. TeleCheck Servs., Inc.*, 923 F.3d 458, 467 (6th Cir. 2019); *Robertson v. Allied Sols., LLC*, 902 F.3d 690, 697 (7th Cir. 2018); *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 346–47 (4th Cir. 2017).

[10] Recall that the Secretary has provided much of the additional information requested by Plaintiffs and required by the district court's injunction.

"opportunity" to identify voters incorrectly described by the Secretary's data base expresses a speculative rather than concrete grievance. To support standing, however, Plaintiffs' injury must be more than speculative and must be "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 133 S. Ct. 1138, 1147 (2013); *see also Stringer v. Whitley*, 942 F.3d 715, 721 (5th Cir. 2019) ("whether compliance with the NVRA would prevent future injury to others is irrelevant; plaintiffs seeking injunctive relief must show a continuing or threatened future injury to themselves").

The lack of concrete harm here is reinforced because not a single Plaintiff is a Texas voter, much less a voter wrongfully identified as ineligible, and the Plaintiffs have not claimed organizational standing on behalf of any Texas voter members. They cannot and do not "claim standing on behalf of any voter whose data is likely to be [mishandled]." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 380 (D.C. Cir. 2017). As the D.C. Circuit also explains, "[t]he doctrines of informational and organizational standing do not derogate from the elemental requirement that an alleged injury be 'concrete and particularized.'" *Id.*

The principal cases relied on by Plaintiffs for their freestanding informational injury claim, while superficially appealing, are inapt. *FEC v. Akins* involved "a group of voters with views often opposed to those of [the American Israel Public Affairs Committee], [seeking] to persuade the [Federal Election Commission] to treat AIPAC as a 'political committee.'" 524 U.S. 11, 15–16, 118 S. Ct. 1777, 1781–82 (1998). Plaintiffs in *Public Citizen v. Dep't of Justice* sought "access to [an] ABA Committee's meetings and records in order to monitor its workings and participate more effectively in the judicial selection process." 491 U.S. 440, 449, 109 S. Ct. 2558, 2564 (1989). The Supreme Court in each case essentially concluded that

No. 22-50692

government refusals to compel disclosures of information arguably required by law constituted a concrete Article III injury.

Further, in *Spokeo*, though not in *TransUnion*, the Supreme Court cited *Akins* and *Public Citizen* for the proposition that "the violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact. In other words, a plaintiff in such a case need not allege any *additional* harm beyond the one Congress has identified." *Spokeo*, 578 U.S. at 342, 136 S. Ct. at 1549 (emphasis in original).

In *TransUnion*, by contrast, the Court distinguished the Fair Credit Reporting Act from the holdings in *Akins* and *Public Citizen*, which "involved denial of information subject to public-disclosure or sunshine laws that entitle all members of the public to certain information." *TransUnion*, 141 S. Ct. at 2214. But the Court noted next in the same paragraph that, "[m]oreover, the [TransUnion] plaintiffs have identified no 'downstream consequences' from failing to receive the required information." *Id.* (citing *Trichell*, 964 F.3d at 1004). The "downstream consequences" sentence seems ambiguous: it might be read to reference only a defect in the *TransUnion* plaintiffs' claims of injury but not to include the "sunshine laws" covered by *Akins* and *Public Citizen*. Or, because that sentence falls within a paragraph rejecting the United States's description of informational injury standing, it could be deemed a defect in that theory even if applied to *Akins* and *Public Citizen.*

We pause, because the Plaintiffs assert that the Secretary allegedly violated a public disclosure provision of the NVRA. Consequently, *Akins* and *Public Citizen*, on one reading of *Spokeo* and *TransUnion*, may dispense with "downstream consequences" on the earlier cases' reasoning that the nondisclosure violation alone creates concrete injury. But while acknowledging that semantic possibility, we believe the better reading of the cases was offered by Judge Katsas in *Trichell*, where he noted that in both

No. 22-50692

*Akins* and in *Public Citizen*, the plaintiffs had actually asserted "downstream consequences" since they needed the information in order to participate directly and actively in, respectively, the electoral and judicial selection processes. *Trichell*, 964 F.3d at 1004. That his descriptive term was quoted by the Supreme Court in *TransUnion* fortifies this analysis. In addition, the Tenth Circuit reasoned exactly the same way in harmonizing *Public Citizen* and *Akins* with *TransUnion*. *See Laufer*, 22 F.4th at 881.

Thus, even in public disclosure-based cases, plaintiffs must and can assert "downstream consequences," which is another way of identifying concrete harm from governmental failures to disclose. Nonetheless, the Plaintiffs here still lack standing. They do not allege that identification of voter names and identification numbers will directly lead to action relevant to the NVRA or any other statute, nor that their direct participation in the electoral process will be hindered.[11] At best, they might at some future date seek to vindicate the specific interests of third party voters whom they (and their counsel) do not represent—which is both speculative and a far cry from concrete injury to Plaintiffs themselves. Plaintiffs' claim lacks downstream consequences for purposes of Article III standing and is not controlled by either *Akins* or *Public Citizen*.[12]

---

[11] After all, the Secretary's list is just a first step in a multi-step process to investigate and remove noncitizen voters from the voter lists. Nondisclosure here in no way disables the Plaintiffs' ability to seek out potential plaintiffs, e.g., from the county registrars from whom they have already obtained information.

[12] We take no position on the concurrence's gratuitous argument offering the plaintiffs an opportunity to cure the deficiency in their standing and sue again. No such issue was raised before us, nor is it appropriate to comment on a party's future litigation strategy.

No. 22-50692

For the foregoing reasons, Plaintiffs lacked standing to sue under the NVRA.  We DENY as moot the Secretary's motion for a stay pending appeal, and REVERSE and REMAND with instructions to DISMISS.

No. 22-50692

James C. Ho, *Circuit Judge*, concurring in the judgment:

Open government is not just a founding principle of our country—it is an essential component of popular sovereignty.  As James Madison observed, "a people who mean to be their own Governors, must arm themselves with the power which knowledge gives."  Letter from James Madison to W.T. Barry (Aug. 4, 1822), *in* The James Madison Papers at the Library of Congress, 1723–1859: Series 1, General Correspondence.

Congress has given effect to this founding principle by enacting laws such as the Freedom of Information Act, 5 U.S.C. § 552.  The premise of laws like FOIA, and like the provisions presented in this case, is simple: Information about our government should be made available to citizens based on their *right* to know—not on their *need* to know.

Members of Congress have echoed this vision.  *See*, *e.g.*, 162 Cong. Rec. S1495–96 (daily ed. Mar. 15, 2016) ("[T]he Freedom of Information Act is premised on . . . the public's right to know what their government is doing on their behalf. . . . It shouldn't be incumbent on an American citizen asking for information from their own government . . . to come in and prove something to be able to get access to something that is theirs in the first place.") (statement of Sen. Cornyn during debate over 2016 amendments to FOIA).

As have various agencies within the Executive Branch.  *See*, *e.g.*, U.S. Dep't of the Treasury, The Freedom of Information Act Handbook 1 (July 2010) (under FOIA, "the 'need to know' standard has now been replaced by a 'right to know' standard").

The judiciary once reflected this vision as well.  In *Public Citizen v. U.S. Department of Justice*, 491 U.S. 440 (1989), for example, the Supreme Court noted that "[o]ur decisions interpreting the Freedom of Information

No. 22-50692

Act have *never* suggested that those requesting information under it need show more than that they sought and were denied specific agency records." *Id.* at 449 (emphasis added). "[A] plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *FEC v. Akins*, 524 U.S. 11, 21 (1998).

So under longstanding precedent, plaintiffs do not have to state their need to know in order to sue under laws like FOIA.

The Supreme Court recently altered its approach, however. Under current precedent, it is no longer enough to show that the government has denied a request for information. "An asserted informational injury that causes no adverse effects cannot satisfy Article III." *TransUnion LLC v. Ramirez*, 594 U.S. __, __, 141 S. Ct. 2190, 2214 (2021) (quotations omitted). So mere denial of information, without more, is insufficient to establish injury in fact under Article III.[1]

To demonstrate Article III injury today, then, plaintiffs must now separately identify what "'downstream consequences'" they will suffer "from failing to receive the required information." *Id.* In other words, they must establish a tangible injury that flows from the denial of the information—separate and apart from the denial of the information itself.

This change in standing jurisprudence may trouble those who believe in the foundational importance of open government. *See*, *e.g.*, Erwin Chemerinsky, *What's Standing After* TransUnion LLC v. Ramirez, 96 N.Y.U. L. Rev. Online 269, 271, 283 (2021) ("I cannot find a single case

---

[1] The Court altered its approach over a number of dissenting voices. *See*, *e.g.*, *id.* at 2220-21 (Thomas, J., dissenting) ("A statute that creates a private right and a cause of action . . . gives plaintiffs an adequate interest in vindicating their private rights in federal court. . . . [T]he unlawful withholding of requested information causes 'a sufficiently distinct injury to prove standing to sue.'") (quoting *Public Citizen*, 491 U.S. at 449).

where a federal court has questioned the standing of a person to challenge the denial of a Freedom of Information Act request.  But after *TransUnion*, it is unclear whether suits to enforce the Freedom of Information Act still will be allowed. . . . It is hard to overstate how dramatic this could be in limiting the ability to use under federal laws if the Supreme Court follows this in the future."); *cf. Villarreal v. City of Laredo*, 44 F.4th 363, 378 (5th Cir. 2022) ("Open government is a founding principle of our country.") (quotations omitted).

But I wonder if there is any real cause for alarm.  After *TransUnion*, it may no longer be entirely accurate to say that laws like FOIA are premised on the right to know, rather than the need to know.  But *TransUnion* may not ultimately prove all that difficult for plaintiffs who wish to assert their statutory rights to public information.  After all, it's hard to imagine a plaintiff who is willing to go through the trouble to file a lawsuit to obtain public information—yet is unable to attach a simple affidavit noting why the plaintiff needs that information.

Consider this case.  There may be any number of ways that Plaintiffs here can establish a "downstream consequence" that they will suffer if denied the information they seek.  Perhaps the information is necessary to engage in public advocacy about a pressing matter of policy—as was the case for Washington Legal Foundation and others in *Public Citizen*.  Perhaps the information is essential to furthering Plaintiffs' mission to protect the voting rights of various communities.  Perhaps they can articulate yet another need for the information.

As the majority points out, Plaintiffs did not present evidence of a downstream consequence in this case.  But as counsel for the State of Texas repeatedly acknowledged during oral argument, the evidence of injury required by *TransUnion* is "not . . . burdensome."

No. 22-50692

Given the State's acknowledgment of the low evidentiary burden, it would not be surprising if Plaintiffs responded to today's decision by assembling evidence of downstream consequences for a future lawsuit. If Plaintiffs do, it will be for the district court to address in the first instance. *See*, *e.g.*, *Lopez v. Pompeo*, 923 F.3d 444, 447 (5th Cir. 2019) ("A dismissal for lack of jurisdiction . . . does not operate as an adjudication on the merits. The dismissal permits a second action on the same claim that corrects the deficiency found in the first action.") (cleaned up); *Hughes v. United States*, 71 U.S. 232, 237 (1866) ("If the first suit was dismissed for . . . want of jurisdiction . . . the judgment rendered will prove no bar to another suit.").[2]

With these observations, I concur in the judgment.

---

[2] The panel majority criticizes this paragraph as a "gratuitous argument offering the plaintiffs an opportunity to cure the deficiency in their standing and sue again. No such issue was raised before us, nor is it appropriate to comment on a party's future litigation strategy." *Ante*, at 13 n.12.

With great respect, I don't understand the charge. The paragraph above simply mirrors what Justice Alito said in *California v. Texas*, ___ U.S. ___, ___, 141 S. Ct. 2104, 2135 n.9 (Alito, J., dissenting), involving Texas's most recent challenge to the Affordable Care Act.

There, the district court entered judgment on the merits in favor of the plaintiffs. That judgment was later reversed for lack of standing—but only after the Court identified a potential theory of standing that the plaintiffs simply neglected to present. *See id.* at 2116; *see also id.* at 2133–35 (Alito, J., dissenting). That led Justice Alito to observe that, "[i]f the effect of the Court's decision is dismissal of this action for lack of Article III jurisdiction, the States may file a new action." *Id.* at 2135 n.9.

This case is identical in all relevant respects. Here, as in *California*, the district court entered judgment on the merits in favor of the plaintiffs. Here, as in *California*, that judgment was later reversed for lack of standing—but only after this court identified a potential theory of standing that the plaintiffs simply neglected to present. And here, that leads me to make the same observation that Justice Alito made in *California*—that the plaintiffs "may file a new action." *Id.* The same neutral principles of law should apply whether Texas is the plaintiff (as it was in *California*) or the defendant (as it is here).